IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 25178-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN E. LIPINSKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J. — John E. Lipinski appeals his merged first degree manslaughter and

second degree felony murder convictions (relating to Melissa S. Saldivar) and second

degree felony murder conviction (relating to her prematurely delivered daughter,

Mataya). Mr. Lipinski's trial occurred in 2006. We stayed his appeal in 2008 to await

the outcome of pending public trial cases because some jurors in Mr. Lipinski's case

were interviewed in a jury room, and not in open court. See In re Pers. Restraint of

Morris, 176 Wn.2d 157, 288 P.3d 1140 (2012); State v. Sublett, 176 Wn.2d 58, 292

P.3d 715 (2012); State v. Paumier, 176 Wn.2d 29, 288 P.3d 1126 (2012); State v. Wise,

176 Wn.2d 1, 288 P.3d 1113 (2012); State v. Momah, 167 Wn.2d 140, 217 P.3d 321

(2009); State v. Strode, 167 Wn.2d 1, 288 P.3d 1113 (2009). Applying the developed

case law to our facts, we hold public trial principles were violated. Thus, we do not reach Mr. Lipinski's bad-act and new-trial contentions. However, we conclude sufficient evidence supports the felony murder conviction relating to Mataya's death and find no error in the trial court's CrR 3.5 rulings. Accordingly, we reverse and remand for trial.

## FACTS

During the evening of August 9, 2005, and into the earlier morning hours of August 10, several individuals were drinking at the home where Mr. Lipinski, Ms. Saldivar, and their one-year-old son were staying. Mr. Lipinski was drinking heavily. Mr. Lipinski was "very intoxicated," but wanted more alcohol. Report of Proceedings (RP) at 387. Ms. Saldivar yelled at him that he did not need any more alcohol; Mr. Lipinski cursed at Ms. Saldivar and told her he would "kill" her. RP at 427.

Mr. Lipinski, Ms. Saldivar, and their son were eventually asked to leave. The two continued to fight in the car. At approximately 4:00 A.M., Mr. Lipinski brought an unconscious Ms. Saldivar to the emergency room, where she later died from cerebral bruising from a blunt force impact. Their one-year-old son was in the backseat. Doctors revived Ms. Saldivar long enough to deliver Mataya who was born with complications due to oxygen deprivation from her mother's injuries. She died seven weeks later.

Officer Jerry Anderson was dispatched to the hospital. Hospital staff informed the officer that Mr. Lipinski provided several conflicting versions of what happened. The officers decided to transport Mr. Lipinski to the police station for more questioning. He

2

was first given his *Miranda*[1] warnings and placed in the police car. At about 7:00 A.M., Mr. Lipinski was taken to a police station interview room. He initially remained silent, but then told the detectives he wanted to talk. He was again given his *Miranda* warnings and he signed a waiver card. Mr. Lipinski told the officers he had gotten out of the car and Ms. Saldivar drove off. She came back and he got in the driver's seat because Ms. Saldivar was too upset to drive. He claimed the two continued to argue and then Ms. Saldivar "jumped out of the car" while he was driving. RP at 233.

After taking Mr. Lipinski's statements, the investigating officer was informed that attorney Scott Hill was retained by Mr. Lipinski's parents. Mr. Hill had been contacted earlier in the day, but did not discover his client's whereabouts until the afternoon. Mr. Lipinski was turned over to Mr. Hill. Following a CrR 3.5 hearing, the court allowed Mr. Lipinski's custodial statements regarding his version of what happened.

The State charged Mr. Lipinski with second degree murder and second degree felony murder based on the predicate crime of second degree assault for Ms. Saldivar's death and second degree felony murder based on the predicate crime of second degree assault for his daughter's death.

During jury selection, the jury venire was given questionnaires. Those answering affirmatively to certain questions regarding pretrial publicity were brought into the jury room for questioning with the judge, prosecutor, defense attorney, Mr. Lipinski and a

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

detective present. The court questioned selected jurors about their knowledge of the case apart from the other jurors to prevent other jurors from being tainted. Mr. Lipinski did not object to this process. The sole reference to this process is the record made after a chambers conference, disclosing the prosecutor, defense counsel, and the trial judge met together and "decided upon a schedule in order to accomplish individual questioning." RP at 262.

During trial, there was testimony that on different occasions, Mr. Lipinski punched Ms. Saldivar, bit her, cut her, and forced her head into a vehicle's dashboard. At her baby shower, Mr. Lipinski got into an argument with Ms. Saldivar, shoved her to the ground and then made a motion as if he kicked her.

Dr. Kelly Mathia testified she delivered the parties' baby by emergency c-section approximately two hours after Ms. Saldivar arrived at the hospital. The decision to perform this procedure was to "save the baby" whose heart rate was up in the "120s." RP at 86. The baby's position was head-down, facing the back of the mother. When asked whether the right side of the baby was facing the right side of the mother, Dr. Mathia answered yes, "at that time." RP at 98. She also answered affirmatively when asked if babies can turn in uterus during the course of pregnancy.

Tracy Hansen, a detective trained in accident reconstruction, testified that Ms. Saldivar did not have injuries on her face, the palms of her hands, her legs, or her feet; rather, her injuries were on the back of her head, her back and elbows. Because of this, Ms. Hansen opined Mr. Lipinski's claim Ms. Saldivar stepped or rolled out of the car was

4

incorrect. Detective Timothy Madsen testified it was 31 inches from the edge of the driver's seat to the passenger-side door handle and, while seat belted, it was easy for him to reach over and open the door.

In his defense, Mr. Lipinski presented the testimony of Steven Kukuruza, a collision reconstructionist. He opined that Ms. Saldivar could have stepped out and then flew in the air, landing on her back.

The jury found Mr. Lipinski guilty of the lesser-included offense of first degree manslaughter and second degree felony murder for Ms. Saldivar's death (these convictions merged) and second degree felony murder for the baby's death.

Mr. Lipinski unsuccessfully requested a new trial based on newly discovered evidence. Mr. Lipinski appealed.

## ANALYSIS

### A. Public Trial

The dispositive issue is whether Mr. Lipinski's constitutional right to a public trial was violated when the court conducted portions of voir dire in a jury room, a separate room from the main courtroom.

Whether a defendant's constitutional right to a public trial has been violated is a question of law that we review de novo. *Paumier*, 176 Wn.2d at 34; *State v. Lormor*, 172 Wn.2d 85, 90, 257 P.3d 624 (2011). A criminal defendant has a right to a public trial under the state and federal constitutions. *Lormor*, 172 Wn.2d at 90-91; U.S. Const. amends. VI, XIV; Const. art. I, § 22. Likewise, the public has a complementary right to

5

open proceedings under the state and federal constitutions. *Lormor*, 172 Wn.2d at 91;

U.S. CONST. amend. I; CONST. art. I, § 10.

The right to a public trial, however, is not absolute, and a trial court may close the

courtroom under certain circumstances. *Momah*, 167 Wn.2d at 148; *State v. Easterling*,

157 Wn.2d 167, 174-75, 137 P.3d 825 (2006). To protect the public trial right and to

determine whether a closure is appropriate, Washington courts must apply the *Bone-*

*Club*[2] factors and make specific findings on the record to justify a closure. *Momah*, 167

Wn.2d at 148-49. The criteria for closure are:

> 1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure and the public.
> 5. The order must be no broader in its application or duration than necessary to serve its purpose.

*Bone-Club*, 128 Wn.2d at 258-59 (quoting *Allied Daily Newspapers v. Eikenberry*, 121

Wn.2d 205, 210-11, 848 P.2d 1258 (1993)). The court is required to consider

"alternatives to closure" to ensure the least restrictive means of closure is adopted.

*Paumier*, 176 Wn.2d at 35; *Wise*, 176 Wn.2d at 10. Failure to conduct a *Bone-Club*

---

[2] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

analysis before closing a proceeding required to be open to the public is a structural error warranting a new trial. *Paumier*, 176 Wn.2d at 35. Our Supreme Court has reasoned, "not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *Sublett*, 176 Wn.2d at 71.

In *Strode*, jury members were brought into the judge's chambers for questioning regarding sensitive topics, with the trial judge, prosecuting attorney, defense counsel, and the defendant present. *Strode*, 167 Wn.2d at 224. The purpose was to protect the jurors' privacy interests. Our Supreme Court held that this amounted to a closure and, because the court did not first conduct a *Bone-Club* analysis, the defendant's right to a public trial was violated. *Id.* at 231. In *Wise* and *Paumier*, the court recently reached similar holdings. *Wise*, 176 Wn.2d at 15; *Paumier*, 176 Wn.2d at 37. The court, however, limited the extent of the right to a public trial in *Sublett*, by holding that a *Bone-Club* analysis is not required when a judge answers a juror's question in chambers with counsel present. *Sublett*, 176 Wn.2d at 135.

By comparison in *Momah*, the trial court, on the recommendation of defense counsel, questioned several jurors privately to protect the defendant's right to a fair trial. 167 Wn.2d at 145-46. The court noted, "due to the publicity of Momah's case, the defense and the trial court had legitimate concerns about biased jurors or those with prior knowledge of Momah's case." *Id.* at 156. The court decided a partial voir dire closure to safeguard the defendant's right to a fair trial was not a structural error and

7

affirmed the defendant's convictions. *Id.* at 151-52. In *Wise*, our Supreme Court, citing *Momah*, reiterated that the public trial right can be subordinate to the right to a fair and impartial jury. *Wise*, 176 Wn.2d at 10. The court distinguished *Momah* from other public trial violation cases on two principle bases: "(1) more than failing to object, the defense affirmatively assented to the closure of voir dire and actively participated in designing the trial closure and (2) though it was not explicit, the trial court in *Momah* effectively considered the *Bone-Club* factors." *Wise*, 176 Wn.2d at 14 (citing *Momah*, 167 Wn.2d at 151-52).

The State argues this case is most analogous to *Momah*. But, unlike in *Momah*, our bare record does not show (1) Mr. Lipinski affirmatively assented to the closure of voir dire, or (2) the trial court effectively considered the *Bone-Club* factors. *See Wise*, 176 Wn.2d at 14 (citing *Momah*, 167 Wn.2d at 151-52)).

This case is more analogous to *Strode* where potential jurors were given a questionnaire and based on certain answers they were questioned privately in the judge's chambers with the judge, prosecutor, defense counsel, and the defendant present. 167 Wn.2d at 223-24. The court held this amounted to "a courtroom closure." *Id.* at 227. And, because the court did not consider the *Bone-Club* factors before the closure, Mr. Strode's public trial right was violated. *Id.* Like in *Strode*, Mr. Lipinski's public trial right was violated by the closure of part of the voir dire proceedings without the requisite consideration of *Bone-Club*. The proper remedy is "remand . . . for a new trial that is open to the public, except as the trial court may direct a closure upon full

8

scrutiny and consideration of the public trial right under *Bone-Club.*" *Wise*, 176 Wn.2d at 19.

In sum, as noted in the facts, the closure record is very minimal to satisfy *Bone-Club*. We do not know who proposed the closure, the seriousness of the pretrial publicity, whether anyone present in the court was given an opportunity to object, whether the proposed closure was the least restrictive means to address the protected interest, if any weighing of competing interest of the proponent and the public took place, and whether the closure was tailored to serve its purpose.

Accordingly, we must reverse Mr. Lipinski's convictions and remand for a new trial. Given our conclusion that reversal and a new trial are warranted, we do not reach Mr. Lipinski's bad-act and new-trial contentions. But, in Part B, we analyze Mr. Lipinski's CrR 3.5 contentions; and, in Part C, we address his evidence insufficiency concerns involving Mataya's death.

## B. CrR 3.5 Statements

The issue is whether under CrR 3.5 the trial court erred in allowing Mr. Lipinski's custodial statements made after counsel was retained by his parents.

We review a trial court's decision after a CrR 3.5 hearing by determining whether substantial evidence supports the trial court's findings of fact, and whether those findings support the conclusions of law. *State v. Broadaway*, 133 Wn.2d 118, 130-31, 942 P.2d 363 (1997). Here, the court found Mr. Lipinski initiated the statements after being advised of his right to counsel.

9

It is constitutionally guaranteed, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964), the Court held this privilege, incorporated via the Fourteenth Amendment, is enforceable against the State. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The motivation for the implementation of this rule is a concern for the voluntariness of confessions procured by "interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Id.* at 464-65.

Similarly, in all criminal prosecutions, "the accused shall enjoy the right to . . . have the assistance of counsel for his defense." U.S. CONST. amend. VI. "When custodial interrogation is conducted in planned absence of counsel without notifying the defendant of counsel's availability and desire to be present during questioning, a defendant has been denied effective assistance of counsel." *State v. Jones*, 19 Wn. App. 850, 852, 578 P.2d 71 (1978). In *Jones*, the suspect voluntarily submitted to a polygraph examination after waiving his constitutional right to an attorney. But while his polygraph was taking place, an attorney called the police department, told them Mr. Jones's mother had retained him, and asked that Mr. Jones not be interrogated unless he was present. The police explained that the polygraph had already begun and that

10

they would not end it. At the end of the test, the examiner told Mr. Jones that he had failed the examination, and another police officer asked if there was anything he wanted to tell the police. Mr. Jones replied that there was not, but he thought he would be convicted. *Id.* at 851-52. Mr. Jones argued that this statement should not have been admitted.

This case is distinguishable from *Jones.* Here, nothing indicates the police had any knowledge that Mr. Lipinski's parents had retained Mr. Hill. Moreover, Mr. Lipinski had already made his statements before the police were notified of Mr. Hill's representation. Soon after, Mr. Lipinski was turned over to Mr. Hill. The record does not show any questioning occurred after being notified that counsel was retained.

In sum, substantial evidence supports the findings that Mr. Lipinski waived his right to counsel, made statements to officers, and then was notified of counsel's representation. Thus, the court properly denied Mr. Lipinski's CrR 3.5 motion and allowed his custodial statements.

Mr. Lipinski argues no probable cause existed to detain him for questioning, but he did not raise this issue below. And, he failed to assign error to it in his opening brief. *See* RAP 10.3(a)(4) (appellant's brief should include "separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error"). Thus, this issue is waived.

Mr. Lipinski, pro se, raises several issues in his statement of additional grounds for review. All of these issues, except one, were adequately addressed by appellate

11

counsel. *See* RAP 10.10(a) (statement of additional grounds is for issues not adequately addressed by counsel). We do address Mr. Lipinski's claim that he did not voluntarily waive his *Miranda* rights before making statements to the investigating officers.

A defendant can knowingly and voluntarily waive his Fifth Amendment rights. "'An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.'" *State v. Rupe*, 101 Wn.2d 664, 678, 683 P.2d 571 (1984) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)). Officers twice gave Mr. Lipinski his *Miranda* rights. Before talking with officers at the police station, Mr. Lipinski signed a waiver card, strong proof that his waiver was voluntary. Nothing in the record suggests he was coerced into waiving his right to remain silent. Instead, the waiver was the product of a free and deliberate choice. Accordingly, his pro se argument fails.

C. Evidence Sufficiency

The issue is whether sufficient evidence supports Mr. Lipinski's second degree felony murder charge for Mataya's death. Mr. Lipinski contends there was insufficient evidence that the baby was a "quick child" at the time of assault to support a murder charge.

Evidence is sufficient when, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.

*State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). When considering the sufficiency of the evidence, all reasonable inferences must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

A person is guilty of second degree murder if he or she commits any felony, including assault, and in the course of the crime or in immediate flight therefrom, he or she causes the death of a person. RCW 9A.32.050(1)(b). Pertinent to this case, second degree assault may be committed by intentionally and unlawfully causing "substantial bodily harm to an unborn *quick child* by intentionally and unlawfully inflicting any injury upon the mother of such child." RCW 9A.36.021(1)(b) (emphasis added). The jury was instructed that a "quick child" is defined as "one that has been seen moving or felt moving within the mother's uterus." RP at 908.

Here, the baby was delivered by emergency c-section approximately two hours after Ms. Saldivar arrived at the hospital to "save the baby," whose heart rate was up in the "120s." RP (March 6, 2006) at 86. The baby's position was head-down, facing the back of the mother "at that time." RP (March 6, 2006) at 98. Dr. Mathia testified that babies may turn in the uterus during the course of pregnancy. While there is no direct testimony that the child moved, Dr. Mathia's testimony implied as much. Common sense dictates that the baby moved since the baby was at seven months of gestation and alive in the womb. A fact finder is expected to bring his or her own "opinions,

13

insights, commonsense, and everyday life experiences" into the fact-finding process. *State v. Carlson*, 61 Wn. App. 865, 878, 812 P.2d 536 (1991). Thus, a reasonable inference can be drawn that the unborn baby was a "quick child" at the time of injury. Therefore, viewing the evidence in the light most favorable to the State, we conclude sufficient evidence exists to support Mr. Lipinski's second degree felony murder charge for Mataya's death.

Reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Brown, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Kulik, J.

14