YU, J. (concurring in part and dissenting in part)
¶425 The majority of this court correctly concludes that petitioner Conner Michael Schierman's convictions should be affirmed, and this opinion fully concurs with the opinion of Justice Gordon McCloud regarding the guilt phase of Schierman's trial.
¶426 However, the trial court did not err in its evidentiary rulings at the penalty phase and Schierman's sentence is not statutorily disproportionate. I therefore respectfully dissent in part for the reasons expressed below.
ANALYSIS
A. Schierman's convictions are properly affirmed
¶427 Justice Gordon McCloud's opinion correctly analyzes and decides the issues relating to the guilt phase of Schierman's trial. By further discussing the de minimis standard that a majority of this court now adopts for reviewing alleged public trial right violations, this opinion does not intend to imply any inconsistency between itself and the opinion of Justice Gordon McCloud on that issue. See lead opinion at 123-27.
1. Our prior rejection of de minimis closures is incorrect and harmful
¶428 Stare decisis plays a critical role in our justice system by " ' "promot [ing] the evenhanded, predictable, and consistent development of legal principles, foster[ing] reliance on judicial decisions, and contributing] to the actual and perceived integrity of the judicial process." ' " State v. Barber, 170 Wash.2d 854, 863, 248 P.3d 494 (2011) (quoting Keene v. Edie, 131 Wash.2d 822, 831, 935 P.2d 588 (1997) (quoting Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed. 2d 720 (1991) )). There is perhaps no context in which these concerns are more salient than in the judicial interpretation and application of constitutional rights. The decision to disavow our constitutional precedent is a weighty one, which must be accompanied by a full and honest account of the reasons that our precedent is " 'incorrect and harmful.' "
*192 Id. (quoting In re Rights to Waters of Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970) ).
a. Our precedent is incorrect because it misapprehends the nature of a de minimis inquiry
¶429 Our precedent rejects the possibility of a de minimis closure and instead assumes that every closure not justified by a Bone-Club[1] analysis on the record, no matter how trivial, violates the public trial right and requires automatic reversal as structural error. This precedent is incorrect because it is based on the assumption that in order to determine whether a closure is de minimis, we would be required to determine whether the closure caused prejudice to the defendant. State v. Shearer, 181 Wash.2d 564, 573, 334 P.3d 1078 (2014) (Owens, J., lead opinion) ("recognizing de minimis violations based on the lack of prejudice to the defendant would conflict with our precedent that public trial rights violations are structural errors and not subject to a harmlessness analysis" (emphasis added)). However, a de minimis inquiry does not require any analysis of whether there was prejudice to the defendant. Instead, a de minimis inquiry considers whether the values underlying the public trial right have been undermined.
¶430 Our precedent is unquestionably correct that it is usually impossible to determine whether structural error has resulted in prejudice to a particular defendant. In most cases, structural errors " 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' " United States v. Gonzalez-Lopez, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed. 2d 409 (2006) (alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed. 2d 302 (1991) ). In proceedings infected by structural error, there are no untainted proceedings to use as a comparison point for determining whether the error was harmless. Sullivan v. Louisiana, 508 U.S. 275, 280, 113 S.Ct. 2078, 124 L.Ed. 2d 182 (1993). Therefore, "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." Gonzalez-Lopez, 548 U.S. at 150, 126 S.Ct. 2557.
¶431 Our precedent is also correct that public trial violations are properly classified as structural error, even though "in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." Weaver v. Massachusetts, 582 U.S. ----, 137 S.Ct. 1899, 1910, 198 L.Ed. 2d 420 (2017). Therefore, if a de minimis inquiry did consider whether an unjustified closure caused prejudice to the defendant, our precedent would be correct in rejecting it.
¶432 However, a properly conducted de minimis inquiry is entirely unrelated to any showing of prejudice or lack of prejudice to the defendant. Instead, as explained by a seminal federal case,
[A] triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury," It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant-whether otherwise innocent or guilty-of the protections conferred by the Sixth Amendment.
Peterson v. Williams, 85 F.3d 39, 42 (2d Cir.) (emphasis added), cert. denied, 519 U.S. 878, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).[2] The test adopted by the Second Circuit in Peterson considers the specific facts of an unjustified closure to determine whether the closure undermined "the values furthered by the public trial guarantee." Id. at 43. If so, then there was a public trial violation regardless of whether there was prejudice to the defendant. Id. at 42.
*193 ¶433 Our precedent is thus incorrect because it rejects the possibility of a de minimis closure based on a misunderstanding of what it means.
b. Our precedent is harmful because it requires automatic reversal based on de minimis closures
¶434 Our rigid treatment of every courtroom closure not preceded by a Bone-Club analysis as a public trial violation amounting to structural error requiring automatic reversal is clearly harmful. It
leads to delayed justice and additional costs, not all of which are quantifiable but which are nevertheless onerous. These can include the time and effort of the courts, the prosecuting agencies, and the defense attorneys, often public defenders, who must retry the cases; the burdens, including possible distress and anxiety, placed on another jury; the burdens placed on victims and other witnesses who must go through the process of another trial; the losses in relevant evidence that come with long-delayed presentation, when witnesses' memories are not as clear as at the time of the original trial; and the dollar costs of the new trials.
State v. Sublett, 176 Wash.2d 58, 103, 292 P.3d 715 (2012) (Madsen, C.J., concurring). Such costs and burdens are, of course, often implicated when any criminal conviction is reversed. But the harms resulting from our inflexible approach to public trial issues simply cannot be justified in light of the flawed reasoning underlying our rejection of the possibility of de minimis closures in which the public trial right was not actually violated.
¶435 This case is certainly not the first one in which it has been pointed out that our public trial jurisprudence is incorrect and harmful. See, e.g., State v. Njonge, 181 Wash.2d 546, 563, 334 P.3d 1068 (2014) (Gonzalez, J., concurring); State v. Smith, 181 Wash.2d 508, 533-38, 334 P.3d 1049 (2014) (Wiggins, J, concurring); Sublett, 176 Wash.2d at 114-28, 292 P.3d 715 (Madsen, C.J., concurring); State v. Paumier, 176 Wash.2d 29, 43-57, 288 P.3d 1126 (2012) (Wiggins, J., dissenting). However, this case perfectly illustrates why we must now disavow it. A majority of this court agrees that justice demands we affirm Schierman's convictions, but a differently comprised majority of this court unanimously agrees that our precedent precludes us from doing so. In this direct conflict between justice and precedent, justice must prevail.
2. We adopt the de minimis inquiry established by federal appellate courts
¶436 Because our precedent is incorrect and harmful, a majority of this court now disavows it and adopts "the wise and widely-accepted Peterson test ... [t]o determine whether a closure was too trivial to implicate the Sixth Amendment guarantee" to a public trial. United States v. Ivester, 316 F.3d 955, 960 (9th Cir. 2003) (citing Braun v. Powell, 227 F.3d 908, 919 (7th Cir. 2000) ; United States v. Al-Smadi, 15 F.3d 153, 154-55 (10th Cir. 1994) ); see lead opinion at 125-26. Determining whether a closure was de minimis requires the court to carefully consider the specific facts surrounding the closure and to determine whether, in light of those facts, the purposes of the public trial right were undermined. Peterson, 85 F.3d at 42-44.
¶437 To a limited extent, this test for de minimis closure resembles the logic prong of the experience and logic test, as both consider the purposes underlying the public trial right. See State v. Russell, 183 Wash.2d 720, 732, 357 P.3d 38 (2015). However, the logic prong uses a categorical, forward-looking approach that considers the purposes of the public trial right in order to determine whether the type of proceeding at issue implicates the public trial right. Id. at 730, 357 P.3d 38. The test for de minimis closure, meanwhile, uses a case-by-case, backward-looking approach that assumes the public trial right is implicated by the proceeding, and then asks whether, in light of the particular facts presented in the individual case, an unjustified closure actually undermined those purposes. Peterson, 85 F.3d at 42.
¶438 The de minimis test thus does not degrade the public trial right or encourage closed proceedings because it can never exempt an entire category of proceedings from the presumption that all proceedings must *194 occur in open court. It is merely an analytical tool applied on review that will always depend on the particular circumstances presented. This must be so because no two trials are identical and no trial is perfect. "[A] trial is a uniquely human affair and can be only as flawless as the judges and lawyers who conduct it. We strive for perfection but rarely attain it. Humans are imperfect." Paumier, 176 Wash.2d at 44, 288 P.3d 1126 (Wiggins, J., dissenting).
3. In this case, the closure of discussions regarding for-cause challenges was de minimis
¶439 As stated above, the test for whether an unjustified courtroom closure is de minimis is whether, in light of the specific facts appearing in the record, the closure actually undermined the purposes of the public trial right.[3] Peterson, 85 F.3d at 43. These purposes are well established: " 'to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury.' It also affirms the legitimacy of the proceedings and promotes confidence in the judiciary." In re Det. of Morgan, 180 Wash.2d 312, 325, 330 P.3d 774 (2014) (citation omitted) (quoting Sublett, 176 Wash.2d at 72, 292 P.3d 715 ).
¶440 To determine whether these purposes were in fact undermined under the circumstances presented, we must carefully consider the record. In making this determination, courts may look to the length of time the courtroom was closed, the reason the courtroom was closed, whether the public actually learned what occurred during the closed proceeding, and whether the closed proceedings related to the ultimate question of guilt or innocence. See Ivester, 316 F.3d at 960 ; Braun, 227 F.3d at 919 ; Peterson, 85 F.3d at 43-44. However, no single factor is either necessary or sufficient. "[T]he methodology employed by the trial court must be the focal point of appellate review." Braun, 227 F.3d at 918.
¶441 Here, the only proceedings relating to for-cause challenges that occurred in chambers were brief arguments by the parties (many of which had already been made in open court the day before) and the court announcing its decisions (which were repeated in open court immediately afterward). See Verbatim Report of Proceedings (VRP) (Jan. 11, 2010) at 263-67; VRP (Jan. 12, 2010) at 16-22, 42. Encouraging witnesses to come forward and discouraging perjury were not implicated, and given how brief the closure was as compared to the entire voir dire process (to say nothing of the entire trial process), it cannot be said the closure, in itself, actually undermined the purposes of the public trial right. VRP (Jan. 12, 2010) at 16 (estimating the in-chambers proceedings would take "less than ten minutes"). And while the closure was not inadvertent, the court here clearly had no intention of shielding either counsels' arguments or its own decisions from public scrutiny-a complete record of the proceedings was contemporaneously transcribed by a court reporter and is publicly available. Id. This served to remind the participants of their functions and responsibilities at the time, and to affirm the legitimacy of the proceedings going forward.
¶442 Courtroom closures not justified by a Bone-Club analysis are never advisable, but that does not mean they are always structural error requiring automatic reversal either. In this case, the closure was de minimis and did not violate the public trial right. Therefore, in accordance with the lead opinion, Schierman's convictions are affirmed.
B. Schierman does not show error in the penalty phase
¶443 Without question, "the experienced trial court judge correctly applied a complicated set of constitutional and evidentiary rules to a contentious and emotionally charged proceeding," and the lead opinion *195 correctly analyzes the vast majority of Schierman's penalty-phase arguments. Lead opinion at 148. However, the trial court did not err in its rulings on the scope of expert testimony that would be allowed by Drs. Mark Cunningham and Mark McClung, and Schierman's sentence is not statutorily disproportionate.
1. Proffered testimony by Dr. Cunningham
¶444 Schierman claims that his sentence should be reversed because the trial court limited a belatedly disclosed expansion of expert testimony from Dr. Cunningham, a proposed defense witness who was ultimately never called to testify. Schierman's argument mischaracterizes the record and draws erroneous conclusions from the effect of the trial court ruling. The trial court did not err.
¶445 It must be recognized at the outset what trial court decision we are reviewing. Well before trial, Dr. Cunningham was properly disclosed as a potential mitigation witness. The disclosure indicated that his testimony would be "concordant with his interviews of [Schierman] in so far as they relate to Alcoholic Blackout /Propensity/History." Clerk's Papers (CP) at 26403. At the completion of the guilt phase, the defense filed a supplemental disclosure, again specifying Dr. Cunningham's testimony would "relate to alcoholic blackout." Id. at 26424. However, in opening statements for the penalty phase, defense counsel stated for the first time that Dr. Cunningham would "testify with respect to what type of criminal behavior is predictive of an inmate's prison behavior" and would include testimony related to future prison behavior. VRP (Apr. 19, 2010) at 86. The State objected to the expanded scope of Dr. Cunningham's proposed testimony on two grounds: violation of the court's discovery orders and relevance. The trial court denied the State's motion and allowed the proposed expansion of the testimony, subject to a relevancy determination. Schierman is thus seeking reversal based on a trial court ruling that was largely in his favor.
¶446 Worth noting is that the trial court would have been justified in excluding all of the expanded testimony based on defense counsel's "blatant and intentional" violation of the court's discovery orders. VRP (Apr. 20, 2010) at 16. Defense counsel never provided an adequate explanation for its failure to timely disclose the full intended scope of Dr. Cunningham's proposed testimony, and the court observed that the only apparent explanation for the defense's "incredibly untimely disclosure," id., was "for tactical reasons," id. at 15. However, the trial court ultimately ruled that it would allow the expanded testimony from Dr. Cunningham regarding future dangerousness, including testimony and opinion about Schierman's development as a child and adolescent, his addictions, his alcohol treatment and recovery, and his institutional adjustment in jail, to the extent they were relevant. VRP (Apr. 30, 2010) at 10.[4]
¶447 Nevertheless, Schierman argues that the trial court erred in limiting part of Dr. Cunningham's proposed testimony by basing its decision on Morva v. Commonwealth, 278 Va. 329, 683 S.E.2d 553 (2009). This argument is simply wrong. Morva would have directed the trial court here to exclude Dr. Cunningham's expanded testimony entirely, and that is not what happened here.
¶448 In Morva, the Virginia Supreme Court upheld the trial court's exclusion of all of Dr. Cunningham's testimony, including the risk assessment specific to the defendant and the Virginia prison system. The court concluded:
It is true that, in this case, unlike Porter [v. Commonwealth, 276 Va. 203, 661 S.E.2d 415 (2008) ], Dr. Cunningham proposed to provide testimony that concerns Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors might bear on his adjustment to prison. However, other *196 testimony Dr. Cunningham proposed to give, and to rely upon in giving a prison risk assessment for Morva, such as potential security interventions that "could be brought to bear" upon Morva, and the rates of assaults in the Virginia Department of Corrections, is, by statute, not relevant to the determination the jury has to make concerning Morva's future dangerousness and therefore would not be admissible evidence.
Morva, 278 Va. at 350, 683 S.E.2d 553. Based on this holding, the argument that the trial court here applied Morva ' s analysis is not supportable. While the State cited Morva in support of its motion to exclude all of Dr. Cunningham's late-disclosed testimony, the trial court denied total exclusion, allowing Dr. Cunningham's relevant testimony that specifically related to Schierman, including the prison risk assessment pertaining specifically to him.
¶449 What Schierman takes issue with is the trial court decision excluding some of Dr. Cunningham's proposed testimony relating to other inmates incarcerated in other state prisons based on relevancy. That decision was not error. Our statute focuses the relevancy inquiry under RCW 10.95.070(8), where the jury is directed to consider "[w]hether there is a likelihood that the defendant will pose a danger to others in the future." (Emphasis added.) The focus of the allowable evidence thus plainly centers on the defendant and his circumstances. Eighth and Fourteenth Amendment to the United States Constitution's jurisprudence similarly supports the trial court's decision to limit Dr. Cunningham's future dangerousness testimony.[5] Even recognizing a relaxed standard applicable in capital proceedings and allowing wide latitude for the admission of testimony, any proposed testimony or expert opinion must relate to the defendant and his or her circumstances to be relevant.
¶450 The trial court here reviewed each proposed, newly disclosed Microsoft PowerPoint slide and excluded some based on relevancy because some individual slides had nothing to do with Schierman personally and involved prison statistics from other states. Meanwhile, the trial court indicated it would allow Dr. Cunningham to testify that past violence in the community is not strongly associated with prison violence and that the severity of the crime is not a good predictor of prison adjustment.[6] CP at 8306 (contents of slide 26). The trial judge
also permitted [Dr. Cunningham] to testify that serious violence is rare in prison (slides 27-28), to the low rates of inmate assaults and homicide in the Washington [Department of Corrections] (slides 29-30), and to the number and proportion of inmates convicted of homicide in Washington prisons (slide 31). CP 8306-07; 109RP 24-25. The court also permitted testimony as to slide 35, which states that nothing about Schierman increased his risk of serious violence in prison, and listed five specific factors that decreased his risk of serious violence. CP 8307; 109RP 25.
Br. of Resp't at 171. This was entirely appropriate because the inquiry focuses on "Mr. Schierman's likelihood of presenting future dangerous [ness] or being involved in the future dangerous acts while confined in the 1 Washington State Department of Corrections." VRP (Apr. 30, 2010) at 3 (emphasis added).
¶451 The record thus shows that the trial court properly Concluded that the relevant testimony would be limited to Schierman's ability to adjust to incarceration, consistent with RCW 10.95.070(8)'s directive that the jury can consider the "likelihood that the defendant will pose a danger to others in the future." The trial court's exclusion of some of *197 Dr. Cunningham's proposed testimony was not erroneous.
2. Proffered testimony by Dr. McClung
¶451 The trial court properly excluded Dr. McClung's testimony regarding traumatic brain injury. "Before allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading." Johnston-Forbes v. Matsunaga , 181 Wash.2d 346, 357, 333 P.3d 388 (2014). Here, the factual foundation for Dr. McClung's proffered testimony was inadequate.
¶452 Because Dr. McClung's proposed testimony was "premised upon a chain of other experts and their evaluations," the trial court correctly considered the foundation of each link in that chain. VRP (Apr. 29, 2010) at 7. The first link in the chain was a report by Dr. Wendy Cohen, which concluded that the scan was "suggestive of a prior insult which involved a compon[e]nt of hemorrhage." CP at 8252. Dr. Cohen did not opine that Schierman's brain scan indicated that he had suffered multiple traumatic head injuries, or even raise that possibility.
¶453 The next link in the chain of expert evaluations was a letter by Dr. Paul Connor, dated April 24, 2010. Dr. Connor concluded, based on Schierman's medical records, that the prior head injury Dr. Cohen found was consistent with a concussive head injury Schierman suffered while playing football in 1997. Id. at 8257. Dr. Connor then noted that "Schierman and his family have reported a number of incidents of domestic violence in which he was struck in the head by his biological father." Id. From these reports, Dr. Connor concluded that "it would appear that Mr. Schierman has experienced multiple head injuries in his life." Id. Dr. Connor did not elaborate on the extent of domestic violence, describe any particular incident, or suggest that any act of domestic violence by Schierman's father may have contributed to the hemorrhaging noted by Dr. Cohen. Nevertheless, Dr. Connor concluded "that a history of multiple head trauma [s] is a more parsimonious etiology than that of [nonverbal learning disorder]." Id. (boldface omitted).
¶454 The next day, Dr. Richard Adler provided the final link in the chain of expert opinions that formed the basis for Dr. McClung's proposed testimony. Dr. Adler opined that Schierman suffered " '[p]ost-concussion syndrome' " after his 1997 football injury. Id. at 8249 (quoting Denise Garvey, When Can Teens Return to Sports After a Head Injury ?, 4 PROCEEDINGS OF UCLA HEALTHCARE 47 (Winter 2000). [http://perma.cc/JS9R-VN9D]. However, Dr. Adler's declaration also states that post-concussion syndrome occurs " '[a]fter a history of head trauma with LOC [loss of consciousness] and post-injury amnesia.' " Id. (second alteration in original) (quoting Garvey, supra, at 47). The trial court thus did not make an unqualified medical judgment about the necessary level of severity for prior head injuries-Dr. Adler, a licensed medical doctor, provided that information.
¶455 However, the trial court correctly concluded that there was no factual evidence that Schierman had a history of multiple head traumawith loss of consciousness and post-injury amnesia. The foundation for Dr. McClung's proposed testimony depended on such a history.
¶456 Even as applied to proffered mitigating evidence in the penalty phase of a capital case, "the trial court maintains its traditional authority 'to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " State v. Davis, 175 Wash.2d 287, 318, 290 P.3d 43 (2012) (quoting Lockett v. Ohio, 438 U.S. 586, 604 n.12, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978) ).[7] Furthermore, " 'mitigating evidence' is not defined as any evidence, regardless of its content or relevance, that would disincline the jury to impose the penalty of death. Mitigating evidence is that which 'in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.' "
*198 State v. Pirtle, 127 Wash.2d 628, 671, 904 P.2d 245 (1995) (quoting State v. Bartholomew, 101 Wash.2d 631, 647, 683 P.2d 1079 (1984) ).
¶457 Dr. McClung's proposed testimony might be properly considered as extenuating or reducing the degree of moral culpability as applied to a person who did have a history of multiple head trauma with loss of consciousness and post-injury amnesia.[8] However, without any foundational evidence that Schierman had such a history, the proposed testimony was irrelevant. The trial court therefore did not err in excluding Dr. McClung's testimony due to its inadequate foundation.
3. Statutory capital sentence review
¶458 Because the trial court did not err in its evidentiary rulings, Schierman's sentence should be affirmed if it passes a statutory capital sentence review, which requires the court to address four issues:
(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4) ; [9 ] and
(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120 ;
(c) Whether the sentence of death was brought about through passion or prejudice; and
(d) Whether the defendant had an intellectual disability within the meaning of RCW 10.95.030(2).
RCW 10.95.130(2). As correctly noted by the lead opinion, the arguments in this case focus on the second and third issues, which are whether Schierman's sentence is disproportionate or was brought about through passion and prejudice. Lead opinion at 182-83.
¶459 Schierman does little to highlight specific facts about himself, his crimes, or comparable cases indicating that "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). Instead, he argues, and the lead opinion agrees, that "Washington's death penalty is imposed in a wanton and freakish manner," such that every capital sentence in Washington should be found statutorily disproportionate. Appellant's Opening Br. at 198; see lead opinion at 182-90. However, as Schierman recognizes, this court has already rejected that argument, and he provides no new information or argument that could justify revisiting our precedent.[10] Appellant's Opening Br. at 198 (citing Davis, 175 Wash.2d at 353-54, 290 P.3d 43 ).
¶460 When conducting a statutory disproportionality review, "[t]he goal is to ensure that the sentence, in a particular case, is proportional to sentences given in similar cases; is not freakish, wanton, or random; and is not based on race or other *199 suspect classifications."[11] State v. Cross, 156 Wash.2d 580, 630, 132 P.3d 80 (2006) (emphasis added). To do this, "we must consider at least (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history, and (4) the defendant's personal history, as well as any additional substantive challenges to the proportionality of the sentence." Davis, 175 Wash.2d at 348, 290 P.3d 43.
¶461 The nature of Schierman's crimes was indisputably horrific. At a time when he knew that Olga Milkin's husband was deployed overseas, Schierman entered her home and killed her along with her two sons, who were three and five years old, and her sister, who was a college student. Olga Milkin and her sister were stripped of their clothing and stabbed repeatedly in the head and neck. Both were stabbed in the neck from the front with such force that the knife actually damaged their spines, and there was evidence that they attempted to fight back, indicating that they endured significant conscious suffering before they died. One of the children was stabbed through the throat from one side to the other, and the other child's throat was cut so deeply that he was nearly decapitated. When Schierman woke up in the Milkins' home and found himself covered in blood with four dead bodies, he took a shower, changed his clothes, and attempted to burn the house down in order to destroy the evidence. The nature of these crimes is at least as brutal as others in which we have upheld a capital sentence. See id. at 349-51, 290 P.3d 43.
¶462 The only aggravating factor submitted to the jury was that "[t]here was more than one victim and the murders were part of a common scheme or plan." RCW 10.95.020(10). However, "[t]he nature of the aggravating circumstances, as well as the number, is important to consider." Davis, 175 Wash.2d at 351, 290 P.3d 43. As applied to the particular facts presented, the nature of this aggravating circumstance goes beyond the minimal statutory requirements-Schierman's crimes ended the lives of a young mother and her two small children while their father was deployed overseas, as well as the children's aunt who was there to help while their father was gone. He literally destroyed the Milkin family and their home.
¶463 Schierman's lack of prior convictions and difficult personal history neither require nor prevent a finding of disproportionality. Id. at 353, 290 P.3d 43 ; Cross, 156 Wash.2d at 633-34, 132 P.3d 80 ; State v. Rupe, 108 Wash.2d 734, 770, 743 P.2d 210 (1987). But in light of the evidence showing Schierman planned these crimes for a time when the victims were particularly vulnerable because Mr. Milkin was deployed overseas, the ruthless nature of the murders themselves, and Schierman's subsequent efforts to destroy the evidence by burning the Milkins' house down, Schierman's sentence is not disproportionate to the penalty imposed in similar cases.
¶464 Schierman also contends that his sentence was brought about by passion and prejudice because the State's case "emphasize[d] that the victims were so 'worthy' that Schierman deserved death regardless of the constraints of the law." Appellant's Opening Br. at 203. However, he largely points to aspects of the State's case that were either entirely proper or harmless. Lead opinion at 135-38 (circumstantial evidence of sexual motivation), 138-142 (Mr. Milkin's military service), 164-66, 168-69 (the Milkins' persecution, immigration, and religious faith). Thus, "[w]e have already addressed and rejected these claims." Davis , 175 Wash.2d at 374, 290 P.3d 43.
¶465 In addition, Schierman raises the fact that the jury was shown "many, many gruesome photographs." Opening Br. of Appellant at 203. Schierman does not specify which photographs he is referring to, but both autopsy and crime scene photographs may be admitted subject to evidentiary rules. State v. Yates, 161 Wash.2d 714, 768, 168 P.3d 359 (2007) (autopsy photographs admissible so long as they are accurate and more probative than prejudicial);
*200 Cross, 156 Wash.2d at 618, 132 P.3d 80 ("Generally, photographs taken by police of a crime scene will be admissible so long as the entry was lawful."). Schierman provides no explanation of how the photographs the jury saw here made an improper appeal to passion or prejudice in this particular case.
¶466 Finally, the State's references to the Holocaust were improper. See lead opinion at 177-79. However, the court instructed the jury to disregard those statements, and when considered in the context of the entire trial and all the evidence presented, it cannot be said that they necessarily so inflamed the passions or prejudices of the jury that its sentencing verdict must be reversed.
CONCLUSION
¶467 This opinion is not intended to either endorse or criticize the wisdom or constitutionality of capital punishment generally, nor is it intended to express any views about the appropriate resolution of any challenges to capital punishment that have been raised in other cases. However, based on the record and issues presented in this case, Schierman's convictions and sentence should be affirmed.
González, J.
Wiggins, J.
STEPHENS, J. (dissenting in part, concurring in part)
¶468 In criminal prosecutions, both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution protect the defendant's right to an open, public trial. Violation of this right has long been recognized as a structural error, generally requiring reversal of the conviction and a new trial. Here, the State recognizes a closure occurred when for-cause juror challenges were considered in chambers. And this court unanimously agrees that our precedent requires reversal of the conviction based on this structural constitutional error. Nonetheless, a majority of the court-comprised of the lead opinion and Justice Yu's concurrence-departs from precedent and disregards the error here as too "trivial" or "de minimis" to warrant any remedy. Recognizing that this court has consistently and repeatedly rejected this situational analysis in past cases, the new majority proclaims that reversing Schierman's conviction due to the violation of his public trial right is too high a price to pay for following precedent, and thus we must choose between precedent and justice. See concurrence at 193 ("A majority of this court agrees that justice demands we affirm Schierman's convictions, but every member of the court unanimously agrees that our precedent precludes us from doing so. In this direct conflict between justice and precedent, justice must prevail.").
¶469 I respectfully dissent.[1] I fail to see the justice in changing our law to avoid giving relief for a constitutional violation to a man whose conviction the majority believes must be affirmed. Once we start down this path, it will become quite easy to dismiss as trivial or de minimis any number of constitutional errors so long as we convince ourselves that the trial, on the whole, was fair, or more generally that "justice demands we affirm." Id.
¶470 Recognition of a triviality standard inevitably results in trivializing constitutional violations, as the history of this standard in other jurisdictions bears out. While the triviality or de minimis notion began as an attempt to avoid reversal based on brief, inadvertent courtroom closures that seemed inconsequential, it has proven impossible to restrain. It is an ersatz doctrine that has no standards and offers no more guidance than a sniff test for courts to determine when a public trial right violation is "bad enough" to warrant a remedy. To now adopt it as a rule of decision in a case involving a deliberate, ordered closure will produce only confusion and lead to inconsistent results. We should *201 adhere to established precedent, and recognize that justice demands a remedy in the face of a public trial violation. The proper remedy is to reverse Schierman's conviction and remand for a full public trial.
DISCUSSION
I. We Should Adhere to Our Public Trial Precedent Because It Is Neither Incorrect Nor Harmful
¶471 Both the State and the majority recognize that we have, many times, considered and rejected adoption of a triviality or de minimis doctrine, and have consistently adhered to the remedy required for a structural constitutional error: reversal and a new trial.[2] Importantly, our cases are based not only on the principles underlying article I, section 22 of our state constitution, but also on decisions from the United States Supreme Court interpreting the Sixth Amendment to the United States Constitution. See, e.g., Waller v. Georgia , 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed. 2d 31 (1984) ; Presley v. Georgia , 558 U.S. 209, 130 S.Ct. 721, 175 L.Ed. 2d 675 (2010). These decisions provide defendants a minimum level of constitutional protection we are not free to disregard.
¶472 Consistent with our own and United States Supreme Court precedent, we decided a trio of cases in 2012 that reaffirmed that a violation of the public trial right is structural error, prejudice is presumed, and a new trial is required. In those cases, a minority of the court argued our precedent was incorrect and harmful and urged the adoption of a de minimis exception of some kind. In re Pers. Restraint of Morris, 176 Wash.2d 157, 288 P.3d 1140 (2012) (plurality opinion); State v. Paumier, 176 Wash.2d 29, 288 P.3d 1126 (2012) ; State v. Wise, 176 Wash.2d 1, 288 P.3d 1113 (2012). Yet, we rejected those arguments. We recognized that the right to a public trial is at the core of our system of justice, and a violation of this right does not require showing that something else went wrong, i.e., that the trial was otherwise unfair. Most recently in 2014, we again confronted the argument for a de minimis exception. State v. Shearer , 181 Wash.2d 564, 573 & n.2, 334 P.3d 1078 (2014) (plurality opinion) (noting that, even prior to the 2012 cases, the court had rejected a de minimis standard as inconsistent with the structural nature of public trial error (citing State v. Easterling , 157 Wash.2d 167, 180, 137 P.3d 825 (2006) )). We again rejected it, observing that, time and time again, we have resisted calls to water down the constitutional right to a public trial in the interest of expediency or based on the perception that a closure was inconsequential. Id .[3]
¶473 Today's lead opinion has found no new arguments to demonstrate that our public trial precedent is incorrect and harmful. The lead opinion does not even attempt to offer reasons and simply rejects what it characterizes as " Shearer's dicta foreclosing the possibility of de minimis violations altogether." Lead op. at 126-27. This is not even an accurate description of our precedent, which fully recognizes that not every court proceeding *202 implicates the public trial right or constitutes a closure. Shearer made this clear, though the majority misreads our discussion in that case of when the public trial right attaches as somehow supporting its adoption of a triviality exception. See id. at 125; cf. Shearer, 181 Wash.2d at 573, 334 P.3d 1078 (" '[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public.' " (quoting State v. Sublett, 176 Wash.2d 58, 71, 292 P.3d 715 (2012) (plurality opinion) (adopting "experience and logic" test))).
¶474 Justice Yu's concurrence proffers reasons, but they are not new; as the concurrence acknowledges, prior dissents have argued, unsuccessfully, that our public trial jurisprudence is incorrect and harmful. See concurrence at 193 (citing State v. Njonge, 181 Wash.2d 546, 563, 334 P.3d 1068 (2014) (Gonzalez, J., concurring); State v. Smith, 181 Wash.2d 508, 533-38, 334 P.3d 1049 (2014) (Wiggins, J, concurring); Sublett, 176 Wash.2d at 114-28, 292 P.3d 715 (Madsen, C.J., concurring); Paumier, 176 Wash.2d at 43-57, 288 P.3d 1126 (Wiggins, J., dissenting)). The concurrence repeats the refrain that our precedent is incorrect because it wrongly equates the de minimis standard with proof of prejudice or harm. See id. at 192. Adherents to the standard insist that evaluating whether a court closure is too trivial to undermine the "values" of the public trial right is not, in fact, a harmless error inquiry. See id. at 192-93; Peterson v. Williams, 85 F.3d 39, 42 (2d Cir.), cert. denied, 519 U.S. 878, 117 S.Ct. 202 (1996). The apparent distinction is that a prejudice analysis considers the defendant's ultimate guilt or innocence, while a triviality analysis considers only whether the defendant was deprived of the protections conferred by the public trial right. Concurrence at 192-93. This distinction is semantic at best. While it is true that the triviality doctrine does not invoke that aspect of harmless error review that considers trial error harmless in the face of overwhelming untainted evidence of guilt, that is not the sum total of harmlessness review. Fully understood, such review necessarily asks whether the defendant suffered a cognizable harm from deprivation of the constitutional right at issue. As one commentator has aptly observed, requiring defendants to demonstrate that a closure tangibly subverted the core values of the public trial right amounts to a harmless error review that is inconsistent with controlling Sixth Amendment precedent:
The triviality doctrine also approaches harmless error analysis, requiring more of defendants than Waller and Presley allow. ... Although these courts [that embrace the de minimis standard] have been careful to distinguish this standard from harmless error analysis, the test still demands much more of defendants than the Supreme Court has deemed reasonable when dealing with the intangible benefits of structural error rights. A defendant in a triviality jurisdiction does not have to show a reasonable possibility that the outcome of the trial would have been different (i.e., prejudice), but he does have to show some kind of specific injury manifested through the undermining of one of four chosen Sixth Amendment values. If he cannot, then the closure was trivial-in other words, harmless. While these courts do not require a showing of prejudice, they do require that defendants show that the closure was not harmless.
Kristin Saetveit, Close Calls: Defining Courtroom Closures Under the Sixth Amendment, 68 STAN. L. REV. 897, 924-25 (2016) (footnote omitted). We have been correct-until today-to consistently reject the de minimis doctrine on this basis.
¶475 Justice Yu's concurrence also argues that our public trial precedent is harmful principally because it requires us to reverse Schierman's conviction and order a new trial. See concurrence at 193. That the seemingly unworthy, as well as the worthy, may reap the benefit of the law is no reason to find it harmful. Moreover, Justice Yu adheres to precedent classifying public trial violations as structural error, even when an unlawful closure might not render a trial fundamentally unfair. See id. at 192 (quoting Weaver v. Massachusetts, 582 U.S. ----, 137 S.Ct. 1899, 1910, 198 L.Ed. 2d 420 (2017) ). Given the clear message-not called into question by today's majority-that trial courts must engage *203 in the analysis under Waller and State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995) before considering any closure, I am baffled that the concurrence considers our "rigid" adherence to this analysis harmful. Concurrence at 192-93. It seems to me that the real harm will come from sending mixed messages, as today's majority does. Trial judges will understandably be confused by the message to maintain open courtrooms unless a closure is justified under the proper analysis, yet to go ahead and close a proceeding when it appears "nothing of significance" will happen. Gibbons v. Savage, 555 F.3d 112, 121 (2d Cir. 2009) (holding closed portion of voir dire violated Sixth Amendment but refusing to reverse based on triviality doctrine because "nothing of significance happened during the part of the session that took place in the courtroom")[4] . The surest way to incentivize trial courts to sedulously protect public trial rights is to make it count when they fall short. See Saetveit, supra, at 931 ("Appellate courts are bending over backwards to avoid reversal, when, in actuality, retrials would encourage more consistent application of Waller 's test at the trial level. That, in turn, would reduce the frequency of these appeals and reversals, as trial judges would more often avoid violating the right in the first place. A fuller conception of Waller 's test would thus lead to a more unified doctrine, stronger protection of the right and more up-front consideration of countervailing concerns in particular cases." (footnote omitted)).
¶476 In sum, our public trial jurisprudence is neither incorrect nor harmful, and there is no call to revisit our precedent in this case. That a bare majority of this court now prefers the triviality standard we have, time and again, rejected, is not a sufficient basis to adopt that standard today. Not only is a course change unwarranted, but as explained below, it is also unwise.
II. The Triviality or De Minimis Doctrine Offers No Clear Guidance for Courts, Stands in Tension with Controlling United States Supreme Court Precedent, and Produces Unjust and Inconsistent Results
¶477 Neither the lead opinion nor Justice Yu's concurrence tells us much about how the triviality or de minimis doctrine works in practice. Examination of some cases invoking the exception sheds light on its reach. The doctrine purports to isolate the tangible values of the public trial right, and then asks the defendant to make a fact-based showing that they were harmed.[5] For example, since one of the values is to encourage honest testimony, a triviality analysis asks whether any testimony took place during closed proceedings. See, e.g., Gibbons, 555 F.3d at 121 (holding values of encouraging witnesses to come forward and discouraging perjury were not implicated by closed voir dire because no *204 witnesses testified). It also looks at the length of the closure, when it occurred (for example, during voir dire or midtrial), and whether it was inadvertent. See, e.g., Peterson, 85 F.3d at 41 (finding error trivial when bailiff inadvertently kept courtroom locked during 15-20 minutes of witness's testimony); State v. Brown, 815 N.W.2d 609 (Minn. 2012) (finding error trivial when judge locked courtroom during reading of jury instructions in order to keep the jury attentive).
¶478 Not surprisingly, courts have gone in various directions applying the doctrine. The same closure has been found trivial by one court, but reversible in the absence of a Waller analysis by another. Compare Peterson, 85 F.3d at 43 (applying triviality standard to courtroom closure during witness testimony), with Tinsley v. UnitedStates, 868 A.2d 867, 871, 875 (D.C. 2005) (requiring full Waller test to examine closure of courtroom during witness testimony). The Ninth Circuit has deemed a closure trivial based on the conclusion that "questioning the jurors to determine whether they felt safe is an administrative jury problem" with "no bearing on Ivester's ultimate guilt or innocence," confirming the blurry line between this doctrine and harmless error review. United States v. Ivester, 316 F.3d 955, 960 (9th Cir. 2003). Another court has invoked the doctrine without specific reliance on any of the identified values of a public trial, based simply on the conclusion that the closed proceeding was, overall, fair. See People v. Vaughn, 491 Mich. 642, 668-69, 821 N.W.2d 288 (2012) (referencing Gibbons to conclude that "[b]ecause the closure of the courtroom was limited to a vigorous voir dire process that ultimately yielded a jury that satisfied both parties, we cannot conclude that the closure 'seriously affected the fairness, integrity, or public reputation of judicial proceedings' " (quoting People v. Carines, 460 Mich. 750, 774, 597 N.W.2d 130 (1999) )).
¶479 Over time, the triviality or de minimis exception has moved far beyond its initial application to cases of partial closures, such as the exclusion of a particular individual, or inadvertence in failing to unlock the courtroom door. See UnitedStates v. Gupta, 650 F.3d 863, 874 (2d Cir. 2011) ( GuptaI ) (Parker, J., dissenting) (identifying 18 cases applying triviality exception to partial or inadvertent closures)), opinion vacated and superseded, 699 F.3d 682 (2d Cir. 2011) ( Gupta II ). Courts have even disagreed on whether key factors such as inadvertence are actually important to deem a closure trivial, or instead "constitutionally irrelevant" to the analysis. Walton v. Briley, 361 F.3d 431, 433 (7th Cir. 2004) ; cf. United States v. Al-Smadi, 15 F.3d 153, 154 (10th Cir. 1994) (holding "[t]he denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom").
¶480 The GuptaI case perfectly illustrates the unpredictability of a triviality analysis. In its 2011 opinion, the Second Circuit panel applied its precedent from Peterson and Gibbons to conclude that closure of the entire voir dire was a trivial error because Gupta had not shown how any of the relevant Sixth Amendment values were implicated. Gupta I, 650 F.3d at 868-69 & n.3 (quoting Gibbons that " 'nothing of significance happened' " during the closure, as "neither Gupta nor the dissent has identified any specific events which occurred during voir dire here that are distinguishable from Gibbons, and which might, as a consequence, suggest that the proceedings were unfair or that the prosecutor and judge were unaware of their responsibility to the accused and the importance of their functions-i.e., that the proceedings subverted the two relevant values underlying the public trial guarantee"). Following a petition for certiorari to the United States Supreme Court and rehearing En Banc in the Second Circuit, the panel vacated its opinion and reversed course. See GuptaII , 699 F.3d at 682 n.*. In GuptaII , the panel found the conclusion directly opposite its prior holding to be obvious: "Whatever the outer boundaries of our 'triviality standard' may be (and we see no reason to define these boundaries in the present context), a trial court's intentional, unjustified closure of a courtroom during the entirety of voir dire cannot be deemed 'trivial.' " Id. at 689.
¶481 Beyond being rudderless, the triviality standard demands of a defendant proof *205 that will generally be unavailable. As noted, it places upon the defense the burden of showing that an unlawful closure in fact undermined some or all of the core values of the public trial right. See Peterson, 85 F.3d at 42 ; concurrence at 193-94. This requires evidence, which may not be available when a closure is unaccompanied by a transcript or other record. In rejecting application of a harmless error standard to public trial error, the United States Supreme Court in Waller recognized that " 'it would be difficult to envisage a case in which [the defendant] would have evidence available of specific injury.' " 467 U.S. at 49 n.9, 104 S.Ct. 2210 (quoting United States ex rel.Bennett v. Bundle, 419 F.2d 599, 608 (3d Cir. 1969) ). Critics have thus recognized that the triviality test encounters the same difficulty as harmless error review and is in tension with Waller . See Zach Cronen, Note, Criminal Law: Behind Closed Doors: Expanding the Triviality Doctrine to Intentional Closures -State v. Brown, 40 WM. MITCHELL L. REV. 252, 279 (2013) ("By looking for a tangible piece of evidence to weigh for or against a trivial closure, courts are inching closer to a harmless error analysis."); Recent Case, Criminal Law-Sixth Amendment-Second Circuit Affirms Conviction Despite Closure to the Public of a Voir Dire - United States v. Gupta, 650 F.3d 863 (2d Cir. 2011) , 125 HARV. L. REV. 1072, 075 (2012) ( " Gupta [I] renders the triviality doctrine akin to the harmless error doctrine and thus comes into tension with Waller ).
¶482 The purpose of this dissent is not to catalogue the boundless possibilities the triviality doctrine offers for appellate courts to avoid reversing convictions marred by public trial error. Even this small sampling of case law confirms that the doctrine offers little guidance, as no single consideration is dispositive or any public trial value sufficient in and of itself. See Peterson, 85 F.3d at 44 (refusing to say how the triviality exception may play out beyond the facts of the case); Gupta II, 699 F.3d at 689 (refusing to define doctrine's boundaries); concurrence at 193-94 (recognizing the de minimis test "uses a case-by-case, backward-looking approach"). In sum, the triviality doctrine operates as an ad hoc, post hoc, sniff test. Its sole purpose is to allow appellate courts to excuse public trial violations when the trial, on the whole, seems fair enough.
¶483 Albeit subtly, the majority in this case recognizes that the United States Supreme Court has never embraced the triviality doctrine as consistent with its public trial jurisprudence under the Sixth Amendment. See concurrence at 192 n.2 (stating the inverse proposition: "The Supreme Court of the United States has never rejected the possibility of a de minimis closure"). The recent decision in Weaver, which recognized the petitioner must show prejudice to establish an ineffective assistance of counsel claim in a collateral attack on a conviction, does not foreshadow the Supreme Court's eventual adoption of a triviality test. While the court there rejected the argument that an unjustified closure necessarily renders a trial "fundamentally unfair," this was in the context of rejecting an automatic prejudice rule for purposes of an ineffective assistance of counsel claim. See Weaver, 137 S.Ct. at 1911. The court in Weaver adhered to its precedents in Waller and Presley, reaffirming that although courtroom closures may be justified in some circumstances, it is " 'still incumbent upon' the trial court 'to consider all reasonable alternatives to closure [under the Waller test].' " Id. at 1909 (quoting Presley, 558 U.S. at 215-16, 130 S.Ct. 721 ). As noted, critics have recognized the obvious tension between adherence to the Waller test and application of a triviality analysis, in that the former requires a preclosure examination of justified reasons to close a proceeding, while the latter eschews this requirement to excuse a closure after the fact.
¶484 Furthermore, application of a triviality test is inconsistent with United States Supreme Court precedent that refuses to reduce specific Sixth Amendment protections to a generalized "fairness" inquiry; the Court has warned that this approach
in effect reads the Sixth Amendment as a more detailed version of the Due Process Clause-and then proceeds to give no effect to the details. It is true enough that the purpose of the rights set forth in that Amendment is to ensure a fair trial; but it does not follow that the rights can be *206 disregarded so long as the trial is, on the whole, fair. What the Government urges upon us here is what was urged upon us (successfully, at one time, see Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed. 2d 597[ ] (1980) ) with regard to the Sixth Amendment's right of confrontation-a line of reasoning that "abstracts from the right to its purposes, and then eliminates the right." Maryland v. Craig, 497 U.S. 836, 862[, 110 S.Ct. 3157, 111 L.Ed. 2d 666] (1990) (Scalia, J., dissenting).
United States v. Gonzalez-Lopez, 548 U.S. 140, 145, 126 S.Ct. 2557, 165 L.Ed. 2d 409 (2006).
¶485 Today's majority justifies its decision to adopt the triviality exception in the interest of doing justice (i.e., not reversing otherwise valid convictions) and avoiding the rigid structural error rule. What it fails to appreciate, however, is that the structural error analysis compelled under the Sixth Amendment by Waller, and under article I, section 22 of our state constitution by Bone-Club, is not a rigid rule. As explained below, these cases fully allow courts to meaningfully assess when it is possible to close proceedings consistent with the constitutional guaranty of a public trial. But, unlike the triviality doctrine, they provide a principled analysis that safeguards the public trial right.
III. The Well-Established Standards for Evaluating Closures under Waller and Bone-Club Provide the Flexibility Courts Need without Diminishing the Public Trial Right
¶486 The majority's motivation for embracing the triviality standard appears to be a desire to avoid a rigid, inflexible rule of automatic reversal in the face of inconsequential closures. There is no such rule. Behind the seemingly draconian label of "structural error" is the real public trial doctrine that has developed since Waller. This doctrine is flexible and takes into account the competing values that face a trial court in deciding whether to close a particular proceeding.
¶487 Waller and Bone-Club recognize that the defendant's right to a public trial is not absolute but may give way to other values, including the right to a fair trial or the interest in inhibiting disclosure of sensitive information. See Waller , 467 U.S. at 45, 104 S.Ct. 2210. This court in Bone-Club set forth the necessary analysis:
"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
"4. The court must weigh the competing interests of the proponent of closure and the public.
"5. The order must be no broader in its application or duration than necessary to serve its purpose."
128 Wash.2d at 258-59, 906 P.2d 325 (alteration in original) (quoting Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993) ); see also Waller, 467 U.S. at 48-49, 104 S.Ct. 2210 (applying similar analysis).
¶488 The Bone-Club analysis provides a sound rule of decision for trial courts to determine when a closure is justified-an analysis that cannot be made after the fact. See 128 Wash.2d at 261, 906 P.2d 325. The majority's adoption of an ex ante triviality standard only muddies the waters by suggesting to trial courts that in addition to engaging in a Bone-Club analysis, they should consider whether an appellate court will deem a closure made without such analysis too trivial to warrant reversal in any event. Such a message to the trial bench is entirely unhelpful at this juncture in our public trial jurisprudence. By now, every trial judge certainly knows the required analysis, so the need to have a backward-looking "escape valve" is less compelling than it may have seemed in 1996 when the second circuit first announced the triviality exception to *207 avoid reversal in the face of a brief, inadvertent closure.
¶489 We do a disservice to our trial bench when we keep throwing out new ideas. We should apply our precedent with a steady hand rather than making every appeal of a public trial issue a post hoc attempt to rationalize an unlawful closure that, in many cases, could have been lawfully made upon full consideration of the relevant factors under Waller and Bone-Club.
CONCLUSION
¶490The court should adhere to settled precedent under both the Sixth Amendment and article I, section 22 of the Washington Constitution, and apply the constitutionally required remedy for the trial court's violation of Schierman's public trial right: reversal of his conviction and remand for a new trial.
¶491 Because that is not the decision of the court, however, I join in that portion of Justice Yu's concurring opinion upholding Schierman's capital sentence upon review of the required considerations under RCW 10.95.130.
Johnson, J.
Owens, J.

The defense chose not to call Dr. Cunningham to testify, so we have no record of what actual testimony he would have presented. We need not reach the State's argument that Schierman waived any objection to the trial court's limitation of Dr. Cunningham's testimony because Schierman's objections are without merit.

The limits on this traditional authority are the same under both the state and federal constitutions. Davis, 175 Wash.2d at 318 n.12, 290 P.3d 43.

It only "might" be properly considered because Dr. McClung was also unable to reach any conclusion about whether any prior head injuries Schierman may have suffered actually had any impact on his behavior or mental processes. See CP at 8259-60.

RCW 10.95.060(4) provides, "Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' "

This court has shown it is firmly committed to carefully considering new information regarding the constitutionality of capital punishment. See Order, State v. Gregory, No. 88086-7 (Wash. Nov. 21, 2017). That issue is simply not presented here. Schierman does not provide any new information or any new arguments, and the relevant portions of his briefing do not engage in any meaningful analysis of any constitutional provisions. See Appellant's Opening Br. at 197-202; Appellant's Reply Br. at 72-75.

Schierman is white, and there is no indication that race or any other suspect classification was implicated at any point in these proceedings.

This case involves both an appeal and our statutorily required capital sentence review under RCW 10.95.130. Because the decision of the court on the appeal is to affirm Conner Schierman's conviction, my dissent does not relieve me of the obligation to engage in the statutory review. Based on our precedent, I concur in the opinion of Justice Yu that Schierman's capital sentence was validly imposed.

We have recognized that the requirement for a "new trial" is shorthand for the rule of automatic reversal. See State v. Njonge, 181 Wash.2d 546, 554 n.3, 334 P.3d 1068 (2014). In isolated situations in which a public trial error occurs in a pretrial proceeding that can be repeated without any effect on the trial, the lesser remedy of invalidating that proceeding maybe appropriate. Id. (citing Waller v. Georgia, 467 U.S. 39, 49, 104 S.Ct. 2210, 81 L.Ed. 2d 31 (1984) (ordering new suppression hearing, with new trial necessary "only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties")). Where it is not certain that the invalid proceeding will have no effect on the trial, however, a new trial is required. See State v. Bone-Club, 128 Wash.2d 254, 262, 906 P.2d 325 (1995).

The lead opinion suggests that none of our prior cases address the situation presented here because they all involved "the determination of facts behind closed doors." Lead opinion at 124. Contrary to the lead opinion's insistence that "[t]his distinction matters to the public trial analysis," id. at 124, we have rejected drawing a line between legal or ministerial issues on the one side and the resolution of disputed facts on the other. In State v. Sublett, a clear majority of this court recognized that such a distinction "will not adequately serve to protect defendants' and the public's right to an open trial." 176 Wash.2d 58, 72, 292 P.3d 715 (2012) (lead opinion of Johnson, J.); see also id. at 138, 292 P.3d 715 ("The legal/factual distinction is simply out of place in the context of the right to a public trial.") (Stephens, J., concurring).

The Second Circuit was the first to embrace the triviality or de minimis exception. See Peterson, 85 F.3d 39. In Gibbons, the court concluded that nothing of significance happened during an afternoon of voir dire in which the public, including the defendant's mother, were excluded from the courtroom, in part because individual jurors were being questioned privately in a room adjacent to the courtroom during that time. Id. at 114, 121. Of course, under subsequent case law, the private questioning of jurors outside the open courtroom, in the absence of a demonstrated need under the Waller or Bone-Club analysis, is itself an unlawful closure. See In re Pers. Restraint of Orange, 152 Wash.2d 795, 100 P.3d 291 (2004). It is therefore ironic that the court in Gibbons relied on this separate closure (which it ex ante deemed justified) as the reason nothing significant took place in the closed courtroom.

Based on Peterson, most courts number the values of a public trial at four, citing the passage in Waller extolling the importance of open courts. See, e.g., Peterson, 85 F.3d at 43 (citing Waller, 467 U.S. at 46-47, 104 S.Ct. 2210 and listing as nonexhaustive the values of (1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibilities to the accused and the importance of their role, (3) encouraging witnesses to come forward, and (4) discouraging perjury). This reflects a reductionist reading of Waller, which does not purport to reduce the value of openness to a meager list, but more broadly explains that " 'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.' " 467 U.S. at 46 n.4, 104 S.Ct. 2210 (quoting Estes v. Texas, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed. 2d 543 (1965) (Harlan, J., concurring)). Indeed, Waller suggests no list is possible, as "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, [yet] the Framers plainly thought them nonetheless real." Id. at 49 n.9, 104 S.Ct. 2210.